UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INNOVATE1 SERVICES INC, et al.,<br><br>　　　Plaintiffs/Counter-Defendants,<br><br>　vs.<br><br>FIRST BRIDGE MERCHANT SOLUTIONS, LLC, et al.,<br><br>　　　Defendants/Counter-Claimants. | Case No.  2:20-cv-07681-SB (AGRx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

　　　This case involves a dispute between an online visa and passport application processor, Plaintiff and Counter-Defendant Innovate Services Inc. (Innovate1), and its former payment processor, Defendant and Counter-Claimant First Bridge Merchant Solutions, LLC (FBMS).  Innovate1 and its owner and president, Anthony Nwachukwu, have brought claims for breach of contract, breach of fiduciary duty, fraud, and conversion.  FBMS has brought counterclaims for breach of contract, fraud, and unfair business practices.  The Court held a bench trial in this case.  After

1

evaluating the evidence at trial and weighing credibility, the Court issues the findings of fact and conclusions of law as set forth below.

## PLAINTIFFS' COMPLAINT

1. Innovate1 provides online visa and passport application processing services, and Nwachukwu is the owner and president of Innovate1. FMBS provides services as a payment processor for merchants like Innovate1.

2. In 2014, Innovate1 contracted with Newworks Limited to provide visa and passport application processing services for the Government of Nigeria. Newworks Limited appointed and authorized a subsidiary, Newworks Inc., to accept the funds on its behalf. Nwachukwu is a 40% owner of Newworks Limited and accepted appointment on behalf of Newworks Inc. Ex. 21.

3. For a company like Innovate1 to accept credit card payments online, it must use a payment processor. From 2011 to 2015, Marc Geolina and Ryan Rainey provided payment processor services to Innovate1 and its predecessor, SW Global LLC, through their company GrayPay. In 2016, Geolina and Rainey approached Innovate1 and proposed a contract for payment processing services with their separate entity, FBMS.

4. On December 15, 2016, Innovate1 and FBMS entered into a merchant agreement (Agreement). Ex. 32. Under the Agreement, FBMS agreed to provide payment processing services for Innovate1's online visa and passport applications and open a reserve deposit account on Innovate1's behalf. FBMS would be entitled to a "discount rate" (or commission) of 5% (which FBMS could increase up to 12% at its discretion) of the total payments transacted, plus various other fees. After deducting the fees to which it was entitled, FBMS was required to settle the funds owed to Innovate1 on a weekly basis. FBMS was also authorized to retain in the reserve account 10% of the total payments received as security for liabilities on a rolling six-month basis.

5. FBMS opened an account at a Bulgarian bank named Transact EU for purposes of processing the transactions for Innovate1. FBMS also set up an application processing interface (API), a software intermediary program that allowed the Innovate1, FBMS, and bank computers to communicate with each other. The record of each transaction made by Innovate1 and its customers (including the date, time, and amount of the transaction) was recorded and saved in real time through the API gateway on the parties' respective server/database.

6. Payment processing under the Agreement occurred for approximately 15 months, starting in December 2016. During this period, however, issues arose with FBMS's reporting on the transactions, including the failure to consistently provide weekly reports. Out of the 64 weeks of transacting business, FBMS provided only 48 weekly summaries. Ex. 261, at 4–5. And when reviewing records of the individual transactions, Innovate1 noticed that the weekly summaries did not accurately report the number of transactions and dollar amounts. Ex. 40. Nwachukwu raised questions about, among other things, FBMS's withholding of excessive reserve amounts and its failure to provide weekly accountings, to settle the accounts on a weekly basis, and to disburse any payments for several weeks.

7. On December 27, 2017, Nwachukwu again raised these issues concerning FBMS's performance and demanded that certain changes be made if Innovate1 were to continue doing business with FBMS. Ex. 196. Nwachukwu also raised issues about "shortfalls in deposits" from January 2017 to December 2017. *Id*. Over the next several weeks, Nwachukwu continued to inquire about obtaining these funds.

8. On March 8, 2018, Innovate1 stopped processing payments through FBMS and began using another processor because of the outstanding issues. Ex. 236. No funds have been distributed to Innovate1 pursuant to the Agreement since February 22, 2018.

9. During trial, both parties conceded that Innovate1's case largely involves

an accounting dispute that turns on a disagreement between the parties' principal experts. At a high level, the disagreement centers around the total amount of money received from the transactions processed by FBMS, the total amount of money retained by FBMS, and the total amount of money paid to Innovate1. A major difference in the experts' conclusions turns on the different data upon which they relied in making their calculations.

10. Plaintiffs' expert, Frank Gramlich, based his calculations on an Excel spreadsheet that contained the API gateway records of all transactions and payments processed through FBMS. Ex. 262. Gramlich calculated Innovate1's damages by applying the rates actually charged by FBMS as shown in its summary reports to the actual sales amounts shown in the spreadsheet. For each week in which FBMS produced a weekly summary but did not include every transaction from the relevant period, Gramlich accepted the rate and fee structure applied by FBMS in the corresponding weekly summary. To recreate summaries for the 16 missing weeks, Gramlich "assumed" that the rate and fee structure did not change within the relevant period and accepted FBMS's rates and fees as stated in the weekly summaries preceding and following the gap. Ex. 261.[1] Gramlich concluded that: (1) $873,275.79 in funds from the transactions were not deposited into the Transact EU account; (2) FBMS took excess fees, commissions, and rolling reserve deposits of $1,987,368.75 from the funds deposited into the Transact EU account; and (3) FBMS failed to release $982,478.50 from the reserve account. Accordingly, Gramlich calculates a total loss of $3,843,123.04. *Id*.

11. FBMS recognized in its closing argument that neither party has provided the Court with perfect source data to determine the amount of money owed to Innovate1, but it objects to the admission of the spreadsheet relied upon by Gramlich.

---

[1] FBMS does not challenge Mr. Gramlich's extrapolated calculation of the various rates and fees.

FBMS argues that the spreadsheet was created by a third-party entity that serves as Innovate1's "IT/back office personnel," Jan. 24 Nwachukwu Decl. ¶ 24, and therefore is hearsay that does not fall within the business records exception, Fed. R. Evid. 803(6).  The spreadsheet contains a list of all payment transactions that were processed through the API gateway; those transactions are "automatically computer-generated" in real time "without human input or review" and are not considered hearsay.  *United States v. Gonzales*, 615 F. App'x 405 (9th Cir. 2015); *see also United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) ("[M]achine statements aren't hearsay.").  The records in the spreadsheet thus fall outside the purview of Rule 801.

  12. Even if the records were hearsay, however, the spreadsheet that contains them falls within the scope of the business records exception.  Nwachukwu explained the process by which the spreadsheet was created.  Each successful payment transaction was recorded by the API and saved on Innovate1's database in the cloud.  Nwachukwu had access to Innovate1's cloud database, which was maintained by Innovate1's IT company, Zetasoft.  Both Nwachukwu and Zetasoft could generate reports from the information stored on the database.  Nwachukwu instructed Zetasoft to provide him with all of the applications processed by FBMS.  Zetasoft downloaded all of the transactions processed by FBMS in the order in which they occurred, from first to last.  The spreadsheet is the result of that download of information—that is, it was not separately prepared but merely downloaded from the cloud database.  FBMS takes issue with the fact that the transactions were presented to the Court in the form of a spreadsheet that was prepared by a third party for purposes of litigation.  But "transferring these records into spreadsheets for purposes of litigation [does not] eliminate[] the business records exception" because "business records in one form may be presented in another for trial."  *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (holding that a database of computer-generated records presented in the form of a spreadsheet prepared by a third party for purposes of litigation fell

within the business records exception). The Excel spreadsheet is merely the form in which Innovate1 presented the underlying transactions to the Court for trial and is therefore admissible.

13. FBMS makes additional arguments challenging the reliability of the spreadsheet. It claims that: (1) the spreadsheet contains fewer data points than the raw data; (2) the spreadsheet did not contain a column that identified FBMS as the processor for each transaction; and (3) the spreadsheet included a column that identified transactions from countries other than the three processed by FBMS (the United States, Canada, and Germany). But the trustworthiness of the record goes to its weight, not admissibility. United States v. Parris, 69 F. App'x 863, 863 (9th Cir. 2003); see also United States v. Scholl, 166 F.3d 964, 978 (9th Cir. 1999) (upholding the admissibility of records that were "merely estimates, and crude ones at that"). And Nwachukwu provided an explanation that the Court finds credible and sufficient to address the reliability issues raised by FBMS. The spreadsheet was extremely voluminous even with a smaller number of data points; other than the fact that no column identifies FBMS as the processor, FBMS does not point to any data point from the raw data that was crucially left out of the spreadsheet. And even without a separate column identifying FBMS as the processor, there are reliable indicia that FBMS was the sole processor of every transaction included in the spreadsheet. First, Innovate1's payment processors "are each assigned specific geographical locations," and no more than one processor is ever assigned to the same country. Jan. 24 Nwachukwu Decl. ¶ 14. FBMS is the only payment processor that handles applications from the United States, Canada, and Germany.[2] Second, Innovate1 uses

---

[2] The country information in the spreadsheet reflects the home address or citizenship of the applicant, not the embassy location—e.g., an Indian citizen may have his or her application processed by the embassy in the United States—and thus the API from which the spreadsheet's transactions are derived contains "only transactions in the

a distinct API for each payment processor, thus only FBMS was using the API from which the spreadsheet data originated.[3]

14. By contrast, FBMS's expert Rodrigo Macias relied on the weekly summaries. The Court does not find that these weekly summaries reflect an accurate record of the total business conducted under the Agreement. Among other things, the Court is not persuaded by FBMS's explanation that the gaps in the weekly summaries—including eight consecutive weeks—represent periods with no transactions at all. The Court does not find this to be credible and finds that the weekly summaries are an unreliable measure of the transactions that occurred during the parties' relationship under the Agreement.

15. In contrast, the Court finds reliable the transaction and payment information reflected in the spreadsheet, which derives from the transactions and payments processed by FBMS for Innovate1 through the API gateway. Although Innovate1 had access to this information at the time the transactions occurred, its failure to notice the extent of the missing funds can be explained by its oversight (and even ineptitude, which came across at times during trial) and does not cause the Court to reject the spreadsheet data as unreliable. Accordingly, the Court relies on the spreadsheet to resolve this accounting dispute and credits the accounting performed by Gramlich.

16. Even if the Court disregarded the spreadsheet and relied on Macias's damages calculations, however, the Court would still find this calculation to include

---

geographic area covered by FBMS and only transactions processed by FBMS." Id. ¶¶ 14, 16.

[3] Nwachukwu also explained that each payment processor is assigned a different sequence of numbers that are used to identify each transaction completed by the processor. FBMS's sequence identification begins the transaction identification number of every transaction it processes, and each transaction appears in increasing sequential order, with no duplicate numbers appearing.

over $1 million in damages. Macias calculated that $591,912.25 was owed to Innovate1, but he assumed that FBMS transferred $583,932.42 to Innovate1 from its Wells Fargo bank account. Ex. 301. Macias testified that he had been unable to verify this transfer and that, if it were found that those payments were in fact not made by FBMS, he would add $583,932.42 to the total amount of damages. There is no reliable evidence that this transfer occurred; and the Court finds that FBMS never paid the $583,932.42 to Innovate1. Accordingly, even if the Court adopted Mr. Macias's calculations, the total loss would be $1,175,844.67.

17. The Court finds that (1) Innovate1 and FBMS had a valid and enforceable Agreement; (2) Innovate1 performed as required by the Agreement; (3) FBMS breached the Agreement by failing to pay the money owed under the Agreement; and (4) caused Innovate1 damages in the amounts set forth by Gramlich.

18. The Court further finds that FBMS breached its fiduciary duty. FBMS maintained the reserve account for Innovate1's benefit and acted as its trustee but failed to safeguard Innovate1's funds in the account and misappropriated the funds by failing to return the monies owed from the reserve account.

19. The Court similarly finds that Plaintiffs have proven their claim for conversion because (1) Innovate1 was entitled to funds in the reserve account, (2) FBMS took possession of those funds and deprived Innovate1 of their possession, which (3) caused damages to Innovate1. *Fong v. E. W. Bank*, 19 Cal. App. 5th 224, 231 (2018) (stating the elements for conversion).

20. Finally, the Court finds that Plaintiffs have not proven their fraud claims by a preponderance of the evidence. See *The Grubb Co. v. Dep't of Real Est.*, 194 Cal. App. 4th 1494, 1503 (2011) (stating the applicable standard of proof). In their Fourth Amended Complaint, Plaintiffs alleged that FBMS represented it had a relationship with a domestic bank at which it would open an account for Innovate1,

Case 2:20-cv-07681-SB-AGR   Document 162   Filed 03/14/22   Page 9 of 14   Page ID #:1362

which was false because FBMS opened an account overseas.[4] Fourth Amended Complaint, Dkt. No. 79, ¶¶ 63–66. The Court finds there is not sufficient evidence that FBMS intended to misrepresent the identity of the bank that maintained the reserve account. Further, Innovate1 failed to prove that it reasonably and detrimentally relied on any negligent or intentional misrepresentation about the identity of the bank. Bank statements show that Transact EU transferred funds to an account in Mauritius maintained by Newworks Inc. as early as January 2017, Ex. 35, and there is no evidence that Plaintiffs could not identify Transact EU as the bank that made these transfers into Newworks's account. Accordingly, Plaintiffs failed to prove their fraud claims.

21. FBMS's affirmative defenses are without merit. FBMS's performance under the Agreement is not excused due to Innovate1's breach because the Court does not find that Innovate1 breached the Agreement (or caused any damage that would justify allowing FBMS to retain the money owed to FBMS). *See* discussion ¶¶ 2–3 *infra* (FBMS's Counterclaims). Similarly, the Court does not find that FBMS is entitled to equitable relief under the unclean hands doctrine because it has not proved that Innovate1 engaged in misconduct by concealing its relationship with Newworks. Indeed, FBMS knew about Newworks's involvement as early as January 2017. *Id*. FBMS also raises an affirmative defense of "no causation," arguing that Innovate1 is

---

[4] The additional alleged misrepresentations in the Fourth Amended Complaint relate to Geolina and Rainey, and the Court previously dismissed the fraud claims against them. Dkt. No. 94. The Court relies on the allegations in the Fourth Amended Complaint because Plaintiffs did not request that the Court conform the pleading to proof (and the Court declines to do so, sua sponte, without giving FBMS an opportunity to respond). Although the unsigned joint proposed pretrial conference order notes that it "shall supersede the pleadings," it does not specify a factual basis for Plaintiffs' fraud claims. Dkt. No. 122-1, at 12. Plaintiffs merely identify the elements of their fraud claims and include a vague description of the evidence they will rely on. The Court does not find this to be a sufficient basis to reform Plaintiffs' fraud claims as pleaded in the Fourth Amended Complaint.

not the real party in interest with respect to the monies owed, and thus cannot recover them as damages. But whether Innovate1 has separate contractual obligations with Newworks Inc. and Newworks Limited does not deprive it of a right to claim the monies owed under its contract with FBMS. FBMS owes the monies to Innovate1 under the parties' Agreement regardless of whether Innovate1 may, in turn, owe an outstanding amount under separate contracts with nonparties. Finally, Innovate1's damages are not uncertain because the Court finds the spreadsheet upon which Gramlich relies admissible and reliable.

22. In summary, the Court finds that FBMS breached its Agreement with Innovate1 (Count 1), breached its fiduciary duty (Count III), and are liable for conversion (Count VII).[5] FBMS therefore owes Innovate1 $3,843,123.04 in damages. The Court does not find that FBMS made intentional and negligent misrepresentations about the identity of the international bank (Counts IV and V).

## FBMS'S COUNTERCLAIMS

1. In its counterclaims, FBMS claims that Innovate1 breached the Agreement, committed fraud, and engaged in unfair business practices by presenting Newworks Limited's transactions as its own.

2. The Agreement contains a provision whereby Innovate1 represented that "no third party has any claim on the funds deposited into [the reserve account]." Ex. 32 ¶ 12. The Court is not persuaded that Innovate1's separate contractual obligations to Newworks Limited and Newworks Inc. created a prohibited third-party claim to the funds in the reserve account—*at least not as contemplated by the contracting parties*. FBMS clearly knew about Newworks's involvement as early as January 2017—only

---

[5] Counts II and VI of Plaintiffs' Fourth Amended Complaint, as well as all claims against Geolina and Rainey, were dismissed on May 31, 2021, pursuant to the Court's order granting in part Defendants' motion to dismiss. Dkt. No. 94.

weeks after entering into the Agreement—and treated Newworks as its client. FBMS sent Innovate1 a letter to be given to Newworks Inc.'s bank representing that "Newworks Inc./Innovate1 Services" was its client, and that FBMS "processes payments for their company utilizing FBMS's payment services." Ex. 41. At trial, FBMS argued that even if it knew about Newworks, Inc., it did not have knowledge of Newworks Limited. The Court finds that FBMS knew that it was processing payments for Innovate1 on behalf of another company, and that it did not matter to it whether that company was Newworks Limited or its subsidiary Newworks Inc.

3. Even if the Court did find that Innovate1 breached the Agreement, committed fraud, or engaged in unfair business practices by representing third-party transactions as its own, FBMS has not demonstrated that Innovate1 caused the claimed damages.

4. On October 5, 2017, Geolina received an email from Paysafe Acquiring that raised concerns about transaction laundering through FBMS's account with Transact EU. Ex. 328. The email does not identify any business other than FBMS. However, FBMS contends that the email refers to concerns that specifically involved Innovate1. Geolina testified that, after receiving this email, he had subsequent conversations with someone at Paysafe or Transact EU about their concerns that Innovate1 was engaged in transaction laundering.

5. On February 9, 2018, Geolina received an email from Transact EU requesting information from FBMS and asking questions about the services provided by Newworks Inc. and the relationship between Newworks Inc. and FBMS. Ex. 228. Geolina did not inform Innovate1 about the request. Nor did Geolina reply to the email or otherwise respond in writing; he testified that he responded by telephone but has no record of the conversation and does not know with whom he spoke.

6. On March 1, 2018, Geolina contacted Innovate1 for information concerning Newworks Inc., and Nwachukwu provided the requested information. Ex. 235. They exchanged a series of emails over the next several days. Geolina testified

that he informed Nwachukwu in a telephone communication in the midst of these email exchanges that FBMS's "banking partner could no longer support wires internationally for Innovate1" because the bank needed to identify the "ultimate beneficiary" of the funds in the account. Geolina Decl. ¶ 43. Innovate1 subsequently provided FBMS with Newworks Limited's agreements with Socketworks Limited, Ex. 237, and Newworks Inc., Ex. 239, which FBMS provided to Transact EU.

  7. On March 29, 2018, Transact EU terminated its agreement with FBMS "due to non-compliance." Ex. 244. It cited a provision in the agreement (Article 5) that allowed Transact EU to terminate its contract with FBMS for fraud, dishonesty, misrepresentation, excessive chargebacks, or information deemed "unsatisfactory." *Id*.; Ex. 29. The letter makes no reference to Innovate1, Newworks Inc., or Newworks Limited. The termination prevented FBMS from accessing the funds held in the reserve account or the API data. FBMS was also placed on a "terminated merchant file list with visa and mastercard associations and black listed [sic] with all banks in the industry." Geolina Decl. ¶ 45. FBMS has been inoperative since being placed on the blacklist. *Id*. ¶ 49.

  8. The Court does not find Geolina's testimony about his communications with Paysafe and Transact EU credible. FBMS did not introduce any additional written documentation that would support his explanations, and Geolina unconvincingly testified that he preferred to communicate by telephone because he believed written communications could be misinterpreted. And despite the apparent threat to its account, FBMS continued to process transactions for Innovate1 for several more months after Paysafe first contacted FBMS, without taking any action or bringing either the emails or any concerns about transaction laundering to Innovate1's attention. In short, the Court finds Geolina's testimony to be self-serving and

unreliable (here and elsewhere).[6]

9. Moreover, Geolina admitted at trial that Paysafe and Transact EU's concerns of transaction laundering applied to accounts FBMS managed for other clients whose funds also have not been released. The Court finds that FBMS failed to demonstrate that Paysafe's transaction laundering concerns were attributable solely to Innovate1, and that Transact EU would not have terminated its relationship with FBMS but for the concern about Innovate1. Accordingly, FBMS has failed to demonstrate that Innovate1 caused the damages that purportedly resulted from the loss of its banking relationship.

10. Even if FBMS could establish that Innovate1 partially or wholly caused the termination of the banking relationship and resulting damage to its business, the Court nevertheless would find that FBMS failed to reliably prove damages. FBMS initially and implausibly contended that it was damaged in the amount of $16,805,052.50 based on its lost revenue between April 2018 and December 2021. Ex. 309 at 5. In his expert report, Macias calculated his estimate of gross revenue by extrapolating from FBMS's 2016, 2017, and 2018 tax returns. Ex. 309B. At trial, however, Macias testified that since proffering his expert report, he had calculated net profits as a more accurate measure of damages. By examining FBMS's tax returns, Macias determined that the average profit margin per year was between seven and twelve percent. Applying that margin to the $16,805,052.50 in gross revenue, Macias determined that FBMS lost profits in the amount of $1.6 million.

11. The Court finds this damages theory unsupported and speculative. First, if Innovate1 was not solely responsible for Transact EU's termination of its contract with FBMS (as FBMS had the same issue with other clients), FBMS's damages

---

[6] The Court generally found the evidence presented by Plaintiffs, including the testimony, to be more credible and reliable than that presented by the defense, and the findings of fact and conclusions of law reflecting that finding.

13

theory does not provide a way for the Court to measure damages caused specifically by Innovate1 (or otherwise provide a legal basis to impose joint and several liability). Second, the damage theory presupposes a continued revenue stream and profit margin extrapolated from three prior years of FBMS's tax returns, which Macias did not adequately explain and is not supported by the evidence.

12. In short, the Court finds that FBMS failed to establish that Innovate1 breached the Agreement (Count I), committed fraud (Count II), or engaged in unfair business practices (Count III) that resulted in damage to FBMS as claimed.

## DISPOSITION

The Court will enter a final judgment separately.

Dated: March 14, 2022



Stanley Blumenfeld, Jr.
United States District Judge